# IN THE SUPREME COURT OF IOWA

No. 11–1398

Filed February 8, 2013

**IN RE THE MARRIAGE OF DIANA L. KIMBRO**
and **STEVEN C. KIMBRO**

Upon the Petition of

**DIANA L. KIMBRO,**

Appellee,

And Concerning

**STEVEN C. KIMBRO,**

Appellant.

On review from the Iowa Court of Appeals.

Appeal from the Iowa District Court for Linn County, Robert E. Sosalla, Judge.

A spouse seeks further review of a court of appeals opinion affirming, as modified, a decree of dissolution. **COURT OF APPEALS DECISION VACATED IN PART AND AFFIRMED IN PART; DISTRICT COURT JUDGMENT AFFIRMED.**

Karen A. Volz of Ackley, Kopecky & Kingery, Cedar Rapids, for appellant.

Matthew J. Brandes and Kerry A. Finley of Simmons, Perrine, Moyer, Bergman, P.L.C., Cedar Rapids, for appellee.

**WIGGINS, Justice.**

On further review, a spouse asks us to determine the fairness of a property distribution and the denial of attorney fees. The court of appeals affirmed the district court decision by upholding the award of an equalization payment, but modified the decision by reducing the amount of the equalization payment from $45,468 to $5000. Additionally, the court of appeals upheld the district court's denial of attorney fees. The court of appeals also denied appellate attorney fees. On the issue of the property distribution, we vacate the court of appeals opinion and affirm the district court decision, because we agree with the district court's calculation of the equalization payment at $45,468. On the denial of trial and appellate attorney fees, we affirm both the court of appeals opinion and the district court decision.

### I. Prior Proceedings.

This appeal involves the dissolution of marriage between Steven and Diana Kimbro. The district court entered the decree dissolving the Kimbro marriage. To equalize the property distribution, the district court required Steven to make an equalization payment to Diana totaling $50,060. The district court later amended the decree and reduced the amount to $45,468 to reflect Diana's tax obligation. Second, the district court awarded Diana physical custody of the parties' two minor daughters and granted her child and spousal support.

Steven appealed, arguing the property distribution with the equalization payment was inequitable, because Diana dissipated her share of a joint bank account, which Steven unilaterally divided upon the parties' separation. Diana cross-appealed, contending the district court erred by denying attorney fees. We transferred the case to the court of appeals. The court of appeals affirmed as modified the district court

decision on the property distribution by reducing the equalization payment from $45,468 to $5000. Finally, the court of appeals affirmed the district court by denying trial and appellate attorney fees.

Diana then sought further review, which we granted.

## II. Issues.

This appeal involves two issues. Diana claims the court erred by decreasing the equalization payment and by refusing to award attorney fees.

## III. Standard of Review.

We review appeals regarding dissolution of marriage de novo, because such actions are equitable proceedings. Iowa Code § 598.3 (2009); Iowa R. App. P. 6.907; *In re Marriage of Schenkelberg*, 824 N.W.2d 481, 484 (Iowa 2012). Under this standard, we defer to the factual findings of the district court. *Schenkelberg*, 824 N.W.2d at 484. However, those findings are not binding upon us. *Id.*; *see also* Iowa R. App. P. 6.904(3)(*g*). We will disturb the district court ruling "when there has been a failure to do equity." *In re Marriage of Schriner*, 695 N.W.2d 493, 496 (Iowa 2005) (citation and internal quotation marks omitted).

We review the denial of attorney fees for an abuse of discretion. *Schenkelberg*, 824 N.W.2d at 484. We reverse the district court's ruling only when it rests on grounds that are clearly unreasonable or untenable. *Id.* A ruling is clearly unreasonable or untenable when it is "not supported by substantial evidence or when it is based on an erroneous application of the law." *Id.* (citation and internal quotation marks omitted).

## IV. Facts.

On our de novo review, we make the following findings of fact. Steven and Diana Kimbro married in Des Moines on August 21, 1993.

Over the course of their seventeen-year marriage, they raised three children. These proceedings only affect two minor children, age fourteen and sixteen.

When the couple had their first daughter, they jointly decided Diana, who had graduated with a bachelor's degree in education from the University of Northern Iowa, would stay home to care for the children. Steven's role would be to support the family financially. Steven received his bachelor's degree from Iowa State University and has worked as a sales representative for various pharmaceutical companies throughout the marriage.

One position Steven held was for the pharmaceutical company, Genentech. His benefits package included corporate stock options. Genentech bought out Steven's stock options in March 2009, paying him $351,682 after federal and state withholdings. The Kimbros placed the proceeds into a jointly held account at Bankers Trust.

By the end of March 2010, Steven accepted a position in sales with his current employer, Response Genetics. Steven earns a salary of $115,000 per year plus commissions. He received guaranteed commissions of $4000 per month for the first three months of his employment. He now averages $4200 per month. Steven is also eligible for bonuses with an estimated total of $36,000. At the time of trial, his projected earnings were approximately $170,400 per year.

During the marriage, Diana made little to no income. In fact, she allowed her teaching certificate to lapse. However, after separating from Steven, she successfully renewed her teaching certificate and began substitute teaching during the 2010–2011 school year for $114 per day. In 2010, she earned $3167. In 2011, she made $5400. Diana estimates

that if she were able to substitute teach for the full, forty-week school year, she would earn approximately $22,800 annually.

On January 18, 2010, Diana informed Steven she had consulted an attorney and was filing for divorce. By that time, the Genentech stock options in the Bankers Trust account had appreciated from $351,682 to $444,053.

The day after Diana told him about the pending divorce, Steven unilaterally removed $226,518 from the Bankers Trust account and placed it in a Bank Iowa account under his name alone. He left the remaining balance of $217,535 in the Bankers Trust account for Diana. At trial, Steven explained his intent for dividing the Bankers Trust account:

> I didn't want to fight about it any further, so I took half of it and put it in there; and I came back and told her I took half out today and *your other half* is still there and so I didn't want her to be decimated and have nothing. *I just said equally right down the middle. That's yours, this is mine.*

(Emphasis added.)

On the same day he transferred the funds, Steven informed Diana of what he had done. Steven admitted he divided the Bankers Trust account without consulting Diana. He also testified that the parties had no agreement concerning how to spend the money.

At the time of trial, Diana had $49,000 remaining from her share of the Bankers Trust account. Steven had $179,000 left.

### V. Property Distribution.

**A. Agreement to Divide the Bankers Trust Account.** The court of appeals reduced the equalization payment by finding Steven and Diana had a predissolution agreement to equally divide the funds in the Bankers Trust account. Diana contends the court of appeals erred by

decreasing the equalization payment on this basis, because no such agreement existed. On our de novo review, we conclude the record does not support the finding of an agreement.

Steven testified he did not consult Diana before dividing the Bankers Trust account. Instead, he admitted to acting on his own. He further testified there was no agreement with Diana as to how she could spend the money from that account. Steven never alleged such an agreement existed before the district court entered the dissolution decree. The first time Steven claimed any agreement existed was in his rule 1.904(2) motion. There, he stated the only agreement between the parties regarded splitting the tax liability. However, on appeal, Steven did not argue an agreement existed.

Diana's testimony confirmed there was no agreement. She indicated that "Steve made the decision" to divide the account, and she "didn't know that he did it until later." Furthermore, when asked as to whether there was any agreement regarding the use of the money once Steven divided it, Diana responded the parties had no such agreement.

Accordingly, we find no evidence of an oral or written agreement to substantiate Steven's claim that the parties agreed to divide the Bankers Trust account. *See In re Marriage of Johnson*, 350 N.W.2d 199, 202 (Iowa 1984) (finding the spouses had an oral agreement to divide the property prior to dissolution). There being no agreement relevant to an equitable property division, we find the court of appeals opinion rests on a finding not supported by the evidence. *See* Iowa Code § 598.21(5)(*k*) (allowing the court to consider "[a]ny written agreement made by the parties concerning property distribution"); *id.* § 598.21(5)(*m*) (permitting the court to consider other relevant factors, including an oral agreement). The record demonstrates Steven unilaterally divided the account between

himself and Diana. Therefore, we cannot treat the Bankers Trust account as being subject to an agreement made by the parties when distributing the Kimbro marital estate.

**B. Dissipation of Marital Assets Doctrine.** Second, the court of appeals reduced the equalization payment upon deciding Diana dissipated marital assets by spending, during the separation period, the majority of the money Steven gave her from the Bankers Trust account. In doing so, the court of appeals adopted Steven's argument that his unilateral division of the Bankers Trust account transformed those funds into the separate property of the respective spouses and resultantly, barred Diana from double-dipping into Steven's remaining funds at the time of dissolution. Diana contends the court of appeals erred by embracing this rationale and subsequently finding the dissipation doctrine applied. We agree with Diana.

A court may generally consider a spouse's dissipation or waste of marital assets prior to dissolution when making a property distribution. *In re Marriage of Burgess*, 568 N.W.2d 827, 828 (Iowa Ct. App. 1997). The dissipation doctrine applies when a spouse's conduct during the period of separation "results in the loss or disposal of property otherwise subject to division at the time of divorce." *Id.* If improper loss occurs, the asset is "included in the marital estate and awarded to the spouse who wasted the asset." *In re Marriage of Fennelly & Breckenfelder*, 737 N.W.2d 97, 106 n.6 (Iowa 2007). However, the doctrine does not apply if the spending spouse used the monies for "legitimate household and business expenses." *Id.* at 106.

There is a two-pronged test for courts to use in analyzing claims arising under the dissipation doctrine. *Id.* at 104. Under the first prong, a court must decide " 'whether the alleged purpose of the expenditure is

supported by the evidence.' " *Id.* (quoting Lee R. Russ, Annotation, *Spouse's Dissipation of Marital Assets Prior to Divorce as Factor in Divorce Court's Determination of Property Division*, 41 A.L.R. 4th 416, 421 (1985) [hereinafter *Spouse's Dissipation of Marital Assets*]). When a spouse claims the other party dissipated assets and can identify the assets allegedly dissipated, the burden shifts to the spending spouse to "show how the funds were spent or the property disposed of by testifying or producing receipts or similar evidence." *Id.* It is not enough for a spouse to merely show the incurrence of expenditures during the period of separation. *Id.* The spouse also must show a nexus between the payment of the expenses and the use of the marital assets at issue. *Id.*

If the record sufficiently establishes the evidentiary basis for the expense, the court advances to the second prong, which asks " 'whether that purpose amounts to dissipation under the circumstances.' " *Id.* at 104 (quoting *Spouse's Dissipation of Marital Assets*, 41 A.L.R. 4th at 421). A court identifies dissipation by utilizing the following factors:

> "(1) the proximity of the expenditure to the parties' separation, (2) whether the expenditure was typical of expenditures made by the parties prior to the breakdown of the marriage, (3) whether the expenditure benefited the 'joint' marital enterprise or was for the benefit of one spouse to the exclusion of the other, and (4) the need for, and the amount of, the expenditure."

*Id.* at 104–05 (quoting *Spouse's Dissipation of Marital Assets*, 41 A.L.R. 4th at 421).

Turning to the first prong, we find Diana satisfies the evidentiary standard. *Id.* at 104. Below are Diana's documented expenses from the date upon which the parties separated and Steven divided the Bankers Trust account (January 19, 2010), to the date the district court entered the dissolution decree (June 17, 2011):

| | |
|---|---|
| Family vacations | $6700 |
| Daughter's non-refundable airline ticket | $745 |
| Car purchases, taxes, licenses, and repairs | $10,694 |
| Son's college tuition (two semesters) | $14,869 |
| Loan to son | $500 |
| Daughters' high school and activity costs | $4235 |
| Gutter and patio cleaning (marital home) | $317 |
| House cleaning (marital home) | $1041 |
| Real estate and income taxes | $10,500 |
| Down payment (Diana's home) | $40,000 |
| Renovations (Diana's home) | $27,055 |
| Home furnishings (Diana's home) | $19,978 |
| Rent (Diana's home) | $16,200 |

These expenses total approximately $152,834. Diana also supplied the district court with bank statements and financial affidavits to prove her expenditures on groceries, restaurants, gasoline, medical fees, utilities, insurance, clothing, hardware store charges, and other living expenses. These bank statements and affidavits itemize expenses exceeding $15,000. Combining these documents and the itemization above, Diana has sufficiently documented how she spent her portion of the Bankers Trust funds during the period of separation. Hence, this is far different from the situation confronting us in the case of *In re Marriage of Williams*, 421 N.W.2d 160 (Iowa 1988), where there were no records verifying the spouse's expenditures. *Williams*, 421 N.W.2d at 165 (identifying dissipation of assets where "[w]e find no accounting of the money").

Still under the first prong, Diana also satisfies the nexus element by sufficiently demonstrating she made those expenditures using the funds in the Bankers Trust account. *In re Marriage of Goodwin*, 606 N.W.2d 315, 322 (Iowa 2000) (requiring a spouse to demonstrate payment of the expenses using the funds in the disputed account). She introduced exhibits documenting that she paid separation expenses, including the costs of gas, groceries, lunch money for the children, clothing, and family vacations, with the funds Steven left behind when he split the couple's liquid assets. Diana also testified that she used the funds in the Bankers Trust account to make the down payment on the new home for her and the minor children, as well as the renovations to that property. Thus, we find the first prong, requiring sufficient evidence of the spouse's expenditures, is satisfied.

We next turn to the second prong and consider the purpose for Diana's expenditures, as well as whether her use of the funds constituted dissipation under the circumstances. Using the factors articulated in *Fennelly*, we find Diana's expenditures were for legitimate living expenses and did not constitute dissipation. 737 N.W.2d at 104–05.

Under the first factor, Diana incurred these expenses over the course of almost seventeen months. *Id.* We recognize this is a lengthy period, such that expenditures will naturally accumulate to a substantial sum. The second factor requires us to consider the typicality of Diana's expenditures. *Id.* A majority of Diana's expenses stem from her role as the primary custodial parent for the two minor daughters. She bore the expense of the children's school and extracurricular activity fees. She also took the children on family trips the couple had planned prior to their separation. Moreover, she provided supplementary financial support to her son in college. As for the remainder of her expenditures,

we find they are typical of her preseparation lifestyle, given the couple had assets of almost one million dollars.

Pursuant to the third factor, we consider the benefits to the joint marital enterprise that arose from Diana's expenditures. *Id.* Certainly, the fees expended to care for the couple's children in their schooling and social activities benefitted both. There is a joint parental responsibility to support children financially. *In re Marriage of Hoak*, 364 N.W.2d 185, 189 (Iowa 1985). Moreover, Diana used the funds to pay the parties' mutual obligations, including expenses Steven had promised to pay, but later did not. She paid half of Steven's income taxes, thereby ensuring his financial stability. *See In re Marriage of Sullins*, 715 N.W.2d 242, 252 (Iowa 2006) (finding a wife is not liable for a husband's tax debts and penalties upon dissolution, because such tax problems are "self-imposed"). She paid to have the marital home cleaned and prepared for sale, in addition to paying half the real estate taxes on the property. These expenditures increased the value of the jointly held, marital home. Moreover, the funds Diana expended to purchase and renovate the new house for her and the children was to the advantage of both marriage partners, because it increased Diana's own net worth, making her less financially dependent on Steven for support.

The final factor under the second prong requires us to consider Diana's need for the expenditures. *Fennelly*, 737 N.W.2d at 104–05. Diana, as primary custodial parent, had to pay the day-to-day living expenses for herself and two children. She had to obtain new housing because Steven refused to move out of the marital home. His refusal to leave created a stressful environment for the children, so Diana acted in the children's interest by locating alternate living arrangements. Diana also needed to purchase vehicles for her children because she was

looking for full-time employment and could no longer transport them. Furthermore, she incurred the high costs that naturally flow from having a child in college, as well as two high-school-age children who attend private school and participate in extracurricular activities. Moreover, the necessity of Diana's reliance on the Bankers Trust account is reasonable, considering she was earning little to no salary during the separation. *Id.* In addition, Steven instructed Diana to use her share of the Bankers Trust account to cover household bills during the separation period.

Although we recognize $168,535 is a significant sum to spend, we find such expenditures over a year and a half do not amount to dissipation under these circumstances, where the spending spouse has essentially no salary, remains responsible for marital obligations, purchases a new home and makes renovations to ensure the home is comfortable for the children, supports three children financially—one in college and the other two in private school with costly extracurriculars— and finally, maintains the lifestyle of a marriage with dissolution assets of almost one million dollars. Moreover, we note there is no evidence in the record to support Steven's allegations that Diana dissipated, hid, depleted, or diverted cash. *See, e.g.*, *In re Marriage of Cerven*, 335 N.W.2d 143, 146 (Iowa 1983) (finding the husband's transfer of $40,000 to his son was a sham gift in an attempt to avoid paying his wife spousal support). Therefore, we affirm the district court's finding that Diana's expenditures were reasonable under the circumstances and consistent with the lifestyle to which she was accustomed. Accordingly, we count the remainder of Steven's share of the Bankers Trust account as marital assets, subject to division.

**C. Equalization Payment.** Concluding the court of appeals lacked a basis supported by substantial evidence to reduce the

equalization payment, we find the district court's award of an equalization payment totaling $45,468 is equitable. We find this matter merits the award of an equalization payment to Diana for several reasons.

First, without the payment, Diana receives approximately $57,000 less in assets than Steven. Such an outcome conflicts with our equitable principles in Iowa Code section 598.21(5), which guides courts in framing property distributions. An equitable distribution of marital property, based upon the factors in 598.21(5), does not require an equal division of assets. *Schriner*, 695 N.W.2d at 499. However, " 'it is generally recognized that equality is often most equitable.' " *Fennelly*, 737 N.W.2d at 102 (quoting *In re Marriage of Rhinehart*, 704 N.W.2d 677, 683 (Iowa 2005)). This court has often approved the equal or nearly equal division of marital assets. *See, e.g., In re Marriage of Duggan*, 659 N.W.2d 556, 562 (Iowa 2003) (requiring modification of a decree to "accomplish an equal division" of the couple's assets); *In re Marriage of Hitchcock*, 309 N.W.2d 432, 438 (Iowa 1981) (recognizing our jurisprudential tradition of affirming awards of "substantial, nearly equal property distribution, especially where the disparity in earning capacity was great"). Accordingly, in applying the factors, we find the $57,000 disparity in the property distribution award is inequitable without the equalization payment to Diana.

To illustrate, we recognize the parties were married for seventeen years, which establishes sufficient commitment to award an equal division of property. Iowa Code § 598.21(5)(*a*); *Fennelly*, 737 N.W.2d at 104 (finding that because the parties were married for nearly fifteen years, an equal division upon dissolution of the appreciation in value of the parties' premarital assets was equitable). Next, taking into

consideration the economic situation of the parties, there is a vast disparity in incomes between Steven and Diana. *Id.* at § 598.21(5)(*f*). Steven currently earns a salary, not including commissions and other bonuses, of $115,000 annually. The most Diana has earned during the marriage is $5400. Such disparity leads to inequity, unless the court imposes some form of equalization. *See Schenkelberg*, 824 N.W.2d at 488 (awarding additional spousal support to the wife after considering the vast disparity in the husband's $400,000 income and the wife's negligible earnings).

For these reasons, we find the equalization payment ordered by the district court was appropriate and necessary to achieve equity in making the property distribution.

## VI. Attorney Fees.

An award of attorney fees is discretionary. *Sullins*, 715 N.W.2d at 255. "Whether attorney fees should be awarded depends on the respective abilities of the parties to pay." *Id.* (citation and internal quotation marks omitted). To determine the ability to pay, we review the parties' entire financial picture, "including their respective earnings, living expenses, and liabilities." *In re Marriage of Willcoxson*, 250 N.W.2d 425, 427 (Iowa 1977).

We conclude both parties have the ability to pay their respective trial and appellate attorney fees. Steven has a substantial income, but also bears the cost of paying his own legal expenses, child support, tuition for the children, spousal support, and the equalization payment. Although Diana has minimal income, she can now afford to pay her own fees upon receipt of the equalization payment. She also obtained an equal share of the marital assets, valued at almost one million dollars. Accordingly, in exercising our discretion, we affirm the district court's

decision and the court of appeals opinion by denying Diana trial and appellate attorney fees.

### VII. Disposition.

We vacate the court of appeals opinion regarding the reduction of the equalization payment. We affirm the district court by ordering Steven to pay Diana an equalization payment of $45,468. We affirm the court of appeals opinion and the district court decision on the denial of trial and appellate attorney fees.

**COURT OF APPEALS DECISION VACATED IN PART AND AFFIRMED IN PART; DISTRICT COURT JUDGMENT AFFIRMED.**